Filed 1/23/24  Chandran v. Stanford University CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| AMSHULY CHANDRAN,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>STANFORD UNIVERSITY,<br><br>    Defendant and Respondent. | H050431<br>(Santa Clara County<br>Super. Ct. No. 21CV381770) |

Amshuly Chandran was a student in a one-year LLM program at Stanford University Law School.  In June 2020, the law school declared her academically ineligible after she received nine credits of failing or unacceptable grades.  Chandran petitioned the law school for reinstatement, but was denied.  Her subsequent grievance and appeal to Stanford University (university) were denied as well.

Chandran then filed a petition for writ of mandate in Santa Clara County Superior Court, seeking to compel the university to reinstate her.  The trial court denied the petition.

On appeal, Chandran argues the university's decision not to reinstate her constituted a prejudicial abuse of discretion, was not supported by substantial evidence, and failed to conform to procedures required by law.  We disagree and affirm.

# I. FACTUAL AND PROCEDURAL BACKGROUND[1]

## A. First instance of plagiarism and subsequent failing grade

Chandran began a one-year International Economic Law Business and Policy (IELBP) LLM program at Stanford Law School in August 2019. On December 15, 2019, she submitted a research paper in her Law 8003 IELBP Colloquium class (Fall Colloquium), a mandatory 2-unit course offered in the autumn quarter of the 2019-2020 school year. Roughly three weeks later, on January 9, 2020, Chandran's professor in the Fall Colloquium reported an honor code violation to the university's office of community standards (OCS), accusing Chandran of plagiarism in connection with the research paper. Chandran was notified of the report on January 16, 2020.

She ultimately agreed to the university's Early Resolution Option (ERO), a process where the charges are resolved without going to a panel, and the student accepts responsibility for the charges and sanctions. As part of the ERO, Chandran was required to complete an academic integrity seminar.

On April 13, 2020, Chandran received a failing grade of F in the Fall Colloquium. According to the law school and university, the F grade was due to the plagiarism.

On May 26, 2020, the OCS informed Chandran that she had completed all sanctions associated with the matter.

## B. Second instance of plagiarism and subsequent failing grade

On January 20, 2020, four days after she had been informed of the first plagiarism accusation, Chandran submitted a research paper in another autumn quarter class—Law 1047, Business, Social Responsibility and Human Rights (Law 1047). On February 11,

---

[1] We draw the facts recited here from the administrative record lodged with the superior court in this action, as well as the pleadings and related filings. (Code Civ. Proc., § 1085; *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559.) The parties have not disputed the contents of the record or any other evidentiary matters in this case.

2020, Chandran was reported to OCS for a plagiarism and Honor Code violation in connection with that research paper.

This alleged violation was eventually considered by a Stanford Judicial Panel (panel) on June 12, 2020. By a vote of 6-0, the panel found that Chandran had committed a violation of the Honor Code through "unpermitted aid (plagiarism)" in completion of her Law 1047 final, which consisted of the research paper submitted on January 20, 2020. The panel's stated rationale for its findings was that Chandran had been "made aware of the Honor Code on multiple occasions, as well as the expectation of properly identifying language copied from other sources by using quotation marks and proper citations. The panel feels that she had sufficient time to have corrected her research paper by properly and comprehensively citing sources and including quotation marks where appropriate."

The panel voted to levy sanctions on Chandran, consisting of: (1) 20 hours of community service to be completed by the end of the autumn quarter of the 2020-2021 school year, 10 of which hours must include a workshop on accurately presenting ideas; and (2) delayed degree conferral for two quarters, meaning Chandran could not complete her degree until the spring quarter of the 2020-2021 school year. The panel's stated rationale for the sanctions was that Chandran's violation "was serious enough to deserve a delayed degree conferral," as it stemmed "not just from a misunderstanding of the technical aspects of properly identifying verbatim source material in the text but also from a lack of clear integration of personal interpretation and source material."

The OCS informed Chandran of the panel's decision by letter on June 24, 2020.

Meanwhile, on June 18, 2020—six days after the panel made its decision, but six days before the OCS informed Chandran about that decision—Chandran received an "F" grade in Law 1047.

## C. Third unsatisfactory grade and academic ineligibility

Independent of the two plagiarism incidents, Chandran also received an "R" grade in her corporations class, Law 1013, in the winter quarter of the 2019-2021 school year.[2] According to the Stanford Law School student handbook for the 2019-2020 school year (handbook), an "R" grade stands for "restricted credit," and "represent[s] work that is plainly unsatisfactory [or] work that if done regularly over the course of the student's law school career would be inconsistent with allowing the student to receive a degree."

On June 26, 2020, Chandran was notified by letter from Jory Steele, academic dean for the law school, that she had been academically disqualified from the LLM program, and was not eligible to continue as a student, effective immediately. The letter explained that, "under the Law School's governing regulations and as set forth in the Academic Performance Requirements for an LLM Degree in the *SLS Student Handbook,* '[a] student in the ... LLM ... program who at any time has received a total of 7 or more units of grades of R and/or F shall be academically disqualified from the Law School and shall not be eligible to continue as a student at the Law School.' " Because Chandran had accumulated nine credits of F or R grades—two units for the Fall Colloquium, three units for Law 1047, and four units for Law 1013—she had exceeded the seven-unit threshold and was academically ineligible.

The letter also informed Chandran that she had the right to petition for reinstatement pursuant to "the Law School's governing regulations and as set forth in the [Stanford Law School] Student Handbook." Regarding the right to petition, the handbook provides: "[a] student who has been academically disqualified from the Law School may submit a written petition for reinstatement to the Reinstatement Committee, which is comprised of the Vice Dean, Associate Dean of Curriculum, and Dean of Admissions. The Reinstatement Committee shall consider whether the student has met

---

[2] The record does not specify exactly when the "R" grade was issued or when the winter quarter ended.

4

his or her burden of making an affirmative showing that he or she possesses the requisite ability and motivation to succeed academically and that the disqualification does not indicate a lack of capacity to complete studies at the Law School. Should a majority of the Reinstatement Committee find that the student meets these criteria, the student shall be eligible for reinstatement and able to continue as a student at the Law School subject to any conditions that the committee may impose. The decision of the Reinstatement Committee is final and not subject to review." Finally, the letter noted that the reinstatement committee's decision is "subject to its discretion," and that the committee "may consider any evidence relevant to assessing a student's requisite ability and motivation to succeed academically, including any OCS findings."

### D. Petition for reinstatement

Chandran submitted her petition for reinstatement on July 1, 2020, pursuant to the deadline established by the law school in its June 26, 2020, letter. She included a personal statement, in which she set forth four general categories supporting her petition. First, she emphasized her academic progress, noting that she had successfully completed all but one mandatory course—the Fall Colloquium in which she received an F—and had completed more than the required total minimum course credits to receive her degree. In addition, after receiving the F in the Fall Colloquium, she nevertheless was able to complete the corresponding IELBC Spring Colloquium successfully. Chandran therefore sought reinstatement to allow her to enroll in the Fall Colloquium in the autumn quarter for the 2020-2021 school year, as she had already completed all other graduation requirements.

Second, Chandran stated that she had learned from her mistakes and was staying motivated. With respect to the two plagiarism incidents, she contended that "[t]he violations happened solely because of my ignorance of the manner in which Research Papers are to be written at Stanford." Further, "[t]he incorrect citation methodology and inclusion of verbatim text without using quotes, was my failure and omission. I would

5

like to state that in the Universities in India where I studied, a class assignment could very well be written by reproducing relevant subject matter from pertinent sources, as long as they are cited properly, followed by conclusions drawn. Being my first quarter at Stanford, I was just following such a convention without realizing that it led to a violation of Stanford's Honor code."

She also noted that, following the two plagiarism incidents, she had successfully completed her other courses, including written research papers. In addition, the sanctions levied by the OCS panel in connection with her plagiarism in Law 1047 *delayed* conferral of her degree, which necessarily contemplated that she eventually would obtain it. Accordingly, she asked that the reinstatement committee take note of her positive attitude, motivation, commitment to learning, ability to rectify her mistakes and stay focused, and competence to succeed academically.

Third, Chandran discussed her career plans and financial commitments, explaining that she is an international student from India, in the United States on an F1 visa. If she was not able to continue as a student, she stated, all her efforts "including the previous three and a half years of relevant work experience, planning and persistence to get admission to Stanford would have been for nothing." She noted that she had taken out substantial loans to pursue her degree at Stanford, and if she was not able to complete the program, her career "would be rendered beyond repair and the financial burden would be devastating." She asked that the committee "kindly give me an opportunity to complete the graduation requirements on compassionate grounds by allowing me to continue as a student especially since I am so close to achieving my academic and professional goals."

Fourth, Chandran emphasized that she was working hard and staying positive despite the challenges she had faced. She noted that she had continued with her studies, successfully completing her subsequent courses and completing the OCS proceedings and sanctions, despite the stress of the honor code violations and the onset of the COVID-19 pandemic.

Lastly, Chandran informed the committee that she had asked Professor Alan Sykes, the director of the LLM program and Chandran's professor in her international trade and international investment classes, to "put forth his opinions about my performance and academic inclination to the Reinstatement Committee." On June 29, 2020, Professor Sykes e-mailed the committee members to support Chandran's petition for reinstatement.

Professor Sykes explained that he was aware of Chandran's F and R grades, as well as the plagiarism incident in the Fall Colloquium. He acknowledged that he did not know the details of the academic problems in the other two classes, but he felt that her performance in the international trade and international investment classes was "perfectly competent" and "well above the minimum standard for a passing grade." Accordingly, he believed she possessed the ability to perform at an acceptable level as a law school student, and he favored granting her reinstatement so she could complete the remaining credits needed to obtain her degree.

### E. Denial of petition

The handbook provides that the reinstatement committee "shall make its determination within two weeks of the date of receipt of the petition." On July 21, 2020, however, Chandran had not yet received a determination; accordingly, she followed up with Dean Steele regarding the status of her petition.

On July 31, 2020, Chandran still had not received a determination regarding her petition. She e-mailed Alberto Martin, registrar for the law school, to inquire about the status. Chandran explained that she had not received a response to her July 21 e-mail to Dean Steele, and asked: "who I can contact in this regard? Is there a way that I can directly contact the reinstatement committee? Can I contact Associate Dean of admissions Ms. Faye Deal to find the status? Will that lead to a conflict of interest and bias? Is it likely that anybody from the law school will contact me on this matter? If yes,

then what is the likely time they would take to contact me?" The record does not show that Chandran received a response to that inquiry.

On August 21, 2020, Chandran finally received a determination regarding her petition. The committee stated that it had voted to deny the petition, and that it had reached that decision "only after thoroughly reviewing and carefully evaluating [Chandran's] materials." No other rationale was provided. The committee added that the decision "is final and not subject to review."

### F. Grievance

After her petition was denied, Chandran sought an explanation as to the rationale for its decision. She first e-mailed associate dean Faye Deal on August 25, 2020, asking if she could discuss the matter. Having received no response, she followed up by e-mail on August 31, 2020, copying Dean Steele and Professor Sykes. Chandran explained that she had discussed the denial of her petition with Professor Sykes and, pursuant to his advice, she wished to explore and discuss "certain academic options henceforth, which are in keeping with law school policies, and at the same time, would allow me to fulfil [sic] my degree requirements." She reiterated her request for a rationale for the denial of her petition, and noted that the denial "is clearly overriding" the sanctions imposed by [OCS]."[3]

On August 31, 2020, Dean Steele responded to Chandran, stating that she was "not entirely sure what you are asking. As you know, there is no appeal to a decision based on a petition for reinstatement. If you are asking something else, I'm afraid I do not understand what that is." Chandran replied the following day, explaining that, "[a]s advised by Prof. Sykes, I would like to speak with you and Dean Faye Deal about certain academic options that he is inclined to support." Dean Steele responded later that day: "I am unaware of any additional academic options at this time."

---

[3] As noted above, Chandran had been informed on June 24, 2020, of the sanctions in connection with her honor code violation in Law 1047.

### 1. *Chandran's grievance*

Nevertheless, on September 17, 2020, Chandran filed an "Academic Grievance Statement" with Jenny Martinez, dean of the law school, challenging the denial of the petition for reinstatement (grievance statement). Chandran purported to be following the procedures set forth in the handbook regarding "Student Academic Grievance Procedure," which states: "Any student who believes that he or she has been subjected to an improper decision on an academic matter is entitled to file a grievance to obtain an independent review of the allegedly improper decision, followed by corrective action, if appropriate."

The handbook provides that "[t]he review of grievances or appeals will usually be limited to the following considerations: [¶] (1) Were the proper facts and criteria brought to bear on the decision? Were improper or extraneous facts or criteria brought to bear that substantially affected the decision to the detriment of the grievant? [¶] (2) Were there any procedural irregularities that substantially affected the outcome of the matter to the detriment of the grievant? [¶] (3) Given the proper facts, criteria, and procedures, was the decision one which a person in the position of the decision maker might reasonably have made?"

In her grievance statement, Chandran addressed these factors in turn. First, she argued the proper facts and criteria were not brought to bear because the decision was not based on the handbook. Specifically, she noted the handbook provides that the decision on reinstatement should be based on "whether the student has met his or her burden of making an affirmative showing that he or she possesses the requisite ability and motivation to succeed academically and that the disqualification does not indicate a lack of capacity to complete studies at the Law School." According to Chandran, she could "see no basis on which the Committee considered '…[her] ability and motivation to succeed academically,' " because she had successfully completed 39 units in the LLM program, needing only the two credits in the Fall Colloquium to complete her degree. In

9

addition, she had also fulfilled the requirements of the ERO stemming from the first plagiarism incident, as well as the ongoing procedure of the second OCS complaint, all while successfully completing her regular courses.

Chandran argued that the reinstatement committee's decision was made in violation of the law school's own policies. Specifically, she claimed the committee's disregard for Professor Sykes's recommendation that she be reinstated was in violation of the policy on reinstatement, which provides: "the degree program may review such relevant information as course work completed elsewhere or any other factors deemed to be appropriate for consideration." According to Chandran, "[d]efying the opinions of the Program director shows that the proper criteria has not been borne to make this decision denying reinstatement and, amounts to an outright neglect of University's policies provided for graduate students."

Chandran further argued the reinstatement committee had failed to look into the OCS findings for her two honor code violations, despite the express language in her academic disqualification letter stating that the committee was expected to do so. She noted that she had successfully completed the academic integrity seminar as part of the ERO for her first violation, finishing in the top 25 percent of participants. In addition, the sanctions levied by the OCS panel in connection with her second violation contemplated her subsequent enrollment in the 2020-2021 school year to complete her degree. According to Chandran, "the second OCS charge favoring [enrollment] shows my requisite motivation to succeed academically, which has already been ratified by an OCS Panel that specializes in considering factors like academic capacity and motivation of a student to succeed, to arrive at decisions on sanctions for Honor Code violations." She argued that the reinstatement committee had overlooked those facts and actually used the OCS charges to arrive at a decision detrimental to her: "[t]he detriment is of such a nature that, even if I fulfill the sanctions imposed upon me by the OCS, I will still not be able to get the degree."

10

With respect to the second factor to be considered in reviewing a grievance, Chandran argued that the committee's failure to make a decision within two weeks, as required by the handbook, constituted a procedural irregularity that substantially affected the outcome of the matter to her detriment. She claimed that, had she received the denial decision by mid-July, she could have challenged the decision within 30 days and "subsequently could have had the benefit of a decision at the decanal level by mid-September, the start of instructions for fall quarter. This shows the delay in procedure was clearly aimed at causing detriment to the grievant." Chandran noted that the denial of her petition for reinstatement had "no information on how the vote occurred, the process that was followed and why this decision was taken. This shows the absence of transparency and rationale in the decisionmaking [sic] process."

Finally, with respect to the third factor, Chandran argued that, given the proper facts, criteria and procedures, the decision was not one which a person in the position of the decision maker might reasonably have made. She added that the committee did not consider the adverse financial and academic effects she would face from a denial and, "in light of the above facts, criteria and procedures, the decision denying reinstatement clearly seems unfair, arbitrary and bureaucratic and prejudicial towards the grievant."

### 2. Denial of grievance

Dean Martinez responded to Chandran on September 17, 2020, stating that she had designated Vice Dean Mark Kelman "to oversee the grievance process, and you will receive a response to your grievance within 60 days." On November 30, 2020, Chandran received a response from Susan Fleischmann, associate dean for academic affairs. Dean Fleischmann informed her on behalf of Dean Martinez that "the matter was reviewed by Professor Robert Daines, and he has determined that the denial of your application for reinstatement should not be overturned."

In response to an inquiry from Chandran seeking clarification regarding the denial, Dean Martinez provided Professor Daines's analysis on December 7, 2020, which she

"agree[d] with and adopt[ed] in full." Professor Daines's analysis, dated November 18, 2020, began by stating that Chandran's grievance claim "is governed by the University and Law School policies," citing the same policies and standards Chandran had relied on. He then explained that, "[o]ne initial issue is how to consider Ms. Chandran's appeal and what standard to apply." Recognizing that the university provides that any student may file a grievance for an "improper decision," but that the law school provides that the reinstatement committee's decision is final and not subject to review, Professor Daines first needed to decide "whether Ms. Chandran can appeal the decision."

Professor Daines concluded that the "statement about the finality of the committee's decision is best understood not as an attempt to create an exception to the University's grievance procedures, but a statement about the substantive reasons for granting readmission. That is, the Law School has decided that the bar for readmission is high and that the only chance is through an initial (unreviewable) decision of the Readmission Committee [sic]." For that reason, Professor Daines determined that he would "treat the decision of the Readmission Committee [sic] as a presumptively valid decision, subject only to something like a claim of personal animus, fundamental unfairness or prejudice. In terms of the considerations listed above, this is most closely related to the third criteria specified for a grievance. The facts, criteria and procedure are presumptively valid."

Professor Daines then addressed Chandran's argument that she had the ability and motivation to pass the remaining requirements for graduation. He explained that the relevant question for him was not "whether I think she could pass the last class remaining. Instead, given the Law School's policy, the question is whether the Committee's decision was driven by something improper or unreasonable, such as being motivated by prejudice or personal animus…." In his view, Chandran had "give[n] no reason to think there was any [sic] improper like prejudice or animus."

Professor Daines concluded that the committee's decision was not unreasonable or suspect. Instead, it was "easily seen as a finding that, given her two separate instances of plagiarism and her restricted credits, she did not bear the burden of showing that she possessed the necessary academic ability and capacity for a Stanford Law School degree." He stated that a student's academic integrity "clearly bears on that standard." In his view, the committee "is charged with determining whether Ms. Chandran possessed the necessary academic ability and capacity for a Stanford Law School degree. I don't see any reason to think that the decision was inappropriate here." Accordingly, he concluded that the grievance should be denied.[4]

### G. Appeal of grievance

#### 1. Chandran's appeal

On December 30, 2020, Chandran filed an appeal of the denial of her grievance, submitted to Pervis Drell, Provost of the university. The university's academic grievance procedure provides that, "if the grievant is dissatisfied with the disposition of the grievance at the decanal level, either on substantive or on procedural grounds, he or she may appeal in writing to the Provost."

Chandran set forth both substantive and procedural bases for the appeal. She argued, among other things, that the grievance decision ignored her affirmative showing of her ability and motivation to succeed in the LLM program, and that the law school provided "no transparency on whether these facts were examined in the first place, no grounds for why they were ignored, and show no accountability towards their own policies on reinstatement." In addition, Chandran contended that the grievance statement made unreasonable claims and relied on non-existent policies, specifically its application

---

[4] Four days after she received notice of the denial of her grievance, Chandran received notice from OCS that she had completed her community service sanction, so "the degree hold on your account will remain in place until the start of Summer Quarter 2020-2021, at which time it will be lifted and you will receive a formal notification from our office that the case is closed and the hold lifted from your account."

of a "personal animus, fundamental unfairness or prejudice" standard that is not set forth anywhere in the university's policies. In any case, she claimed, the facts demonstrated such factors were present.

Chandran also argued that the grievance decision applied the incorrect standard by not conducting an "independent review," as required by the university's own policies, and instead treating the reinstatement committee's decision as "presumptively valid."

Finally, she argued that the proper facts, criteria and procedures were not considered in reaching the grievance decision because it was ultimately based on just one factor—academic integrity. Moreover, even in the context of that factor, she argued, the grievance decision ignored the fact that sanctions for the honor code violations had already been levied and contemplated her subsequent enrollment in the 2020-2021 school year.

### 2. *Denial of appeal*

On March 5, 2021, Chandran received notice from Provost Drell that her appeal had been denied. Drell explained that, in accordance with the Student Academic Grievance Procedure, she had asked Professor Stacey Bent, Vice Provost for Graduate Education, to review Chandran's appeal and make a recommendation. Professor Bent considered the documents Chandran submitted, as well as "other documentation that she gathered," interviewed Chandran as well as "several faculty and staff at the [law school] and in Student Affairs," including Martinez, Kelman, Daines and Sykes, and recommended that Provost Drell uphold the denial of the grievance.

Provost Drell explained that Chandran's appeal was reviewed "in accordance with the Student Academic Grievance Procedure," which uses the same factors as in the grievance review process. First, she concluded there was no evidence to support the claim that the "criteria brought to bear on the decision of the [law school] to discontinue you, or the grievance decision of Dean Martinez, were based on anything but the proper facts." She also rejected Chandran's argument that the reinstatement committee did not

14

take Professor Sykes's opinion into account, concluding that "they did consider the input of the Program Director in their review of your case." And she determined that application of standards of "personal animus, fundamental unfairness or prejudice" were "a way of broadening the framework for [Professor Daines's] review to be as inclusive as possible of issues that may have impacted the decision to your detriment."

Second, she rejected Chandran's argument that there had been procedural irregularities which substantially affected the outcome to her detriment, concluding that the proceedings followed established protocols in accord with what is established by the handbook.

Third, she rejected Chandran's argument that the grievance review was not independent, concluding that Professor Daines "conducted a thorough investigation and review trying to be as broad and inclusive as possible in interpretation of his charge to see if there were any grounds on which the decision could be changed."

Fourth, she rejected Chandran's argument that the delay in responding to her petition for reinstatement constituted a procedural irregularity to her detriment. She stated: "I would like to remind you that this activity, including the review of your appeal has taken place in a global pandemic. We have been working remotely for now one full year. Many, including Dean Martinez, Vice Provost Bent and I have been called from our regular obligations to focus on the crisis at hand. A delay such as this does not constitute procedural grounds for overturning an academic decision such as the decisions on your grievance and appeal."

Finally, she concluded that the decision to deny the grievance was reasonable, because the handbook "lays out the criteria for academic disqualification as 'a total of 7 or more units of grades of R and/or F's' and you received 9 units of such grades. This is a reasonable standard for a one year program. They similarly have the right to set standards for reinstatement, and in this case, your 2 honor code violations were an appropriate part of that review."

15

### H. Petition for writ of mandate

Chandran filed a petition for writ of mandate against the university on May 12, 2021, pursuant to Code of Civil Procedure sections 1094.5 and 1085 (petition).[5] The petition alleged that the university's actions, sanctions and decisions were invalid because: (1) they failed to grant Chandran a fair hearing, or any hearing at all; (2) the university committed a prejudicial abuse of discretion in that it failed to proceed in the manner required by law; (3) the decisions were not supported by the findings; and (4) the findings were not supported by the evidence. The petition prayed for an alternative or peremptory writ of mandate directing the university to set aside the findings and sanctions issued against Chandran.

### I. Trial court ruling and appeal

Following briefing and a hearing, the trial court issued its order denying the petition on August 1, 2022 (order). The court first determined that the only decision within the scope of its review was the reinstatement committee's decision in August 2020 to deny Chandran's petition for reinstatement. That is, the university's other decisions—including the denial of the grievance and the appeal—were beyond the scope of the court's review.

The trial court had ordered supplemental briefing "to identify which of the seven decisions is under judicial review." The court viewed Chandran's supplemental brief "as an acknowledgement that because the decision of the Reinstatement Committee to deny Chandran's petition was final and not subject to further review by Stanford, the decisions resulting from the separate and later Academic Grievance process are outside the necessary scope of review by the court."

The court then determined that its review fell under traditional mandamus pursuant to section 1085, rather than administrative mandamus pursuant to section

---

[5] Undesignated statutory references are to the Code of Civil Procedure.

16

1094.5, because the decision at issue did not result from a proceeding in which, by law, a hearing was required to be given. Applying the standards applicable to review under traditional mandamus, the court concluded that Chandran had not shown entitlement to relief.

The trial court's order included the final judgment, which the court entered on August 1, 2021. Chandran timely appealed.

## II. DISCUSSION

### A. *The final decision being challenged*

As a threshold matter, we must identify the university decision or decisions Chandran challenges in this lawsuit, which also requires that we determine which decision was the final decision for purposes of judicial review.

"In the context of administrative proceedings, a controversy is not ripe for adjudication until the administrative process is completed and the agency makes a final decision that results in a direct and immediate impact on the parties." (*Santa Barbara County Flower & Nursery Growers Association v. County of Santa Barbara* (2004) 121 Cal.App.4th 864, 875, citing *Pacific Legal Foundation v. California Coastal Commission* (1982) 33 Cal.3d 158, 170-172.)[6]

"A court may review only a decision by the *final* administrative decision maker." (*SJCBC, LLC v. Horwedel* (2011) 201 Cal.App.4th 339, 350 (*SJCBC*), citing *Abelleira v. District Court of Appeal* (1941) 17 Cal.2d 280, 291 ["Until that administrative procedure

---

[6] Mandamus is available against certain nongovernmental entities, including private universities, to compel them or their officers to perform their legal duties. (See, e.g., *Pomona College v. Superior Court* (1996) 45 Cal.App.4th 1716, 1722, fn. 3; *Valvo v. University of Southern California* (1977) 67 Cal.App.3d 887, 896; *Anton v. San Antonio Community Hospital* (1977) 19 Cal.3d 802, 816-817, abrogated by statute on another point as stated in *Fahlen v. Sutter Center Valley Hospitals* (2014) 58 Cal.4th 655, 678, fn. 11.) The university has not argued that mandamus is not available against it in this case. We assume without deciding that mandamus is an available remedy against the university here.

17

has been invoked and completed, there is nothing that the District Court of Appeal or any other court may review; it cannot interfere in the intermediate stages of the proceeding."]; *McAllister v. County of Monterey* (2007) 147 Cal.App.4th 253, 284-285.)

An agency decision becomes final " ' "when the agency has exhausted its jurisdiction and possesses 'no further power to reconsider or rehear the claim.' " ' " (*SJCBC, supra,* 201 Cal.App.4th at p. 350, quoting *California Water Impact Network v. Newhall County Water District* (2008) 161 Cal.App.4th 1464, 1484-1485 (*Newhall County*).) A matter is not ripe for judicial review until the agency has made its "final" decision. (*SJCBC, supra*, 201 Cal.App.4th at p. 350, quoting *Newhall County, supra*, 161 Cal.App.4th at p. 1485.)

" 'The doctrine of exhaustion of administrative remedies is a closely related concept to finality. The policy reasons behind the two doctrines are similar. The exhaustion doctrine precludes review of an intermediate or interlocutory action of an administrative agency. [Citation.] A party must proceed through the full administrative process "to a final decision on the merits." [Citation.] Each step in the administrative proceeding cannot be reviewed separately, any more than each ruling in the trial of a civil action may be separately reviewed by a separate appeal. Administrative proceedings should be completed before the issuance of a judicial writ. The rule is not a matter of discretion; compliance is a jurisdictional prerequisite to judicial review.' " (*SJCBC, supra*, 201 Cal.App.4th at p. 351, quoting *Newhall County, supra*, 161 Cal.App.4th at p. 1489.) The jurisdictional prerequisite of finality is common to both administrative and traditional mandamus actions. (*Newhall County, supra,* at p. 1485; *Lopez v. Civil Service Commission of the City of San Francisco* (1991) 232 Cal.App.3d 307, 314-315.)

Whether an agency action was final, and therefore ripe for judicial review, is a question of law we review de novo. (*Environmental Defense Project of Sierra County v. County of Sierra* (2008) 158 Cal.App.4th 877, 885; *see also, SJCBC, supra,* 201 Cal.App.4th at p. 346 [exercising independent review over questions of law such as

18

whether exhaustion doctrine applies in a particular case, but substantial evidence test to factual matters concerning what a party did or did not do].)

Applying these standards here, we determine that the reinstatement committee's decision denying Chandran's petition for reinstatement was not a final decision for purposes of judicial review. Although the handbook states that "[t]he decision of the Reinstatement Committee is final and not subject to review," the record demonstrates the contrary. The reinstatement committee's decision was, in fact, reviewed, first by Dean Martinez in the context of the grievance, and second by Provost Drell in the context of the appeal. Moreover, both the law school and university expressly stated that the subsequent reviews were undertaken pursuant to their existing policies. Professor Daines stated that Chandran's grievance claim "is governed by the University and Law School policies," while Provost Drell explained that Chandran's appeal had been reviewed in accordance with the Student Academic Grievance Procedure.

Accordingly, the fact that the handbook *states* that the reinstatement committee's decision is final and not subject to review does not establish that its decision actually was final for purposes of judicial review. (*SJCBC, supra,* 201 Cal.App.4th at p. 350.) Instead, only after the grievance and appeal processes were complete had the university exhausted its jurisdiction and the final decision become ripe for judicial review.[7]

Thus, the denial of Chandran's appeal of the grievance was the final administrative decision that is subject to, and "[within] the necessary scope of review" by the court. For that reason, even if Chandran had "acknowledged" to the contrary, as the trial court found, it would not establish as a legal matter that the reinstatement

---

[7] The university argues that "the Law School could have simply refused to accept Chandran's Academic Grievance." We need not address that argument because the law school *did* consider the grievance, thereby providing additional layers of review and rendering the reinstatement committee's decision preliminary.

committee's decision was the final and only decision subject to judicial review. (*SJCBC, supra*, 201 Cal.App.4th at p. 351.)

Chandran argued in her supplemental brief in the trial court that the reinstatement committee's decision was "the key decision" at issue in the lawsuit. She also stated that the trial court need not review the denial of her grievance or appeal "in order to grant relief and set aside the administrative decision to deny reinstatement and enter judgment" in her favor. The trial court appeared to rely on that language to conclude that the grievance and appeal decisions were beyond the scope of the court's review. For the reasons explained above, we disagree.[8]

Of course, simply because a decision is subject to judicial review does not necessarily mean that a party has adequately challenged it for purposes of carrying her burden. In our discussion below, we address the extent to which Chandran has challenged each relevant decision.

### B. *Administrative or traditional mandamus*

There are two general types of mandamus review: administrative mandamus and traditional, or ordinary, mandamus. (*Martis Camp Community Association v. County of Placer* (2020) 53 Cal.App.5th 569, 593 (*Martis Camp*), citing §§ 1085, 1094.5.) "The nature of the administrative action or decision at issue determines which type of review applies. [Citation.] In general, administrative mandate under [] section 1094.5 is used to review the validity of quasi-judicial decisions resulting from a proceeding in which (1) a hearing was required to be given, (2) evidence was required to be taken, and (3) discretion in the determination of facts was vested in the agency. [Citation.]" (*Martis Camp, supra,* 53 Cal.App.5th at p. 593.) By contrast, traditional mandamus under section

---

[8] We need not decide the extent to which Chandran's challenge to the university's final decision allows her to challenge underlying, preliminary decisions, such as the reinstatement committee's denial of her petition. As we explain below, we determine that, even if Chandran may challenge the reinstatement committee's non-final decision as part of her challenge to the university's final decision, she has failed to carry her burden.

1085 "is used to review ministerial acts, quasi-legislative acts, and quasi-judicial decisions which do not meet the requirements for review under Code of Civil Procedure section 1094.5." (*Ibid.*, citations omitted.)

Chandran argues that section 1094.5 governs here because the "administrative process" in this case—including the reinstatement committee's decision, the grievance denial and the appeal denial—required a hearing to be given and evidence to be taken, and discretion in the determination of facts was vested in the university.[9] Although she acknowledges that no actual hearing was required to be held, she argues that "purely documentary proceedings can satisfy the hearing requirement of [section 1094.5] so long as the agency is required by law to accept and consider evidence from interested parties before makings its decision," which she contends was the case here.

Chandran relies chiefly on *Friends of the Old Trees v. Department of Forestry and Fire Protection* (1997) 52 Cal.App.4th 1383. In that case, the agency argued that the trial court's admission of extra-record evidence had been improper in the context of a petition challenging a timber harvesting plan (THP). (*Ibid.*) The issue hinged on whether review was conducted pursuant to section 1085 or 1094.5, the former allowing such extra-record evidence in certain circumstances, but the latter generally precluding it. (*Ibid.*) The court of appeal held that, although the agency's timber harvesting plan did not require the taking of evidence, it nevertheless satisfied the hearing requirement of section 1094.5 because the agency was "required by law to accept and consider evidence from interested parties before making its decision." (*Id.* at p. 1391.) The court concluded, "[b]ecause the Department's approval of a THP provides numerous opportunities for public and agency input, and the Department is under an obligation to respond in writing to environmental concerns, we believe the Department's THP review process fully satisfies the hearing

_____

[9] At oral argument, counsel for Chandran conceded that no hearing was required to be held by law, and that section 1085 governs. Nevertheless, we address the issue here because the parties raised it in their briefs on appeal.

21

requirement of [] section 1094.5, subdivision (a).... While the Department is not required to hold a trial-type hearing, compliance with the legislative requirements governing the review process guarantees the views of the plan's supporters and detractors will be sufficiently documented to permit judicial review." (*Id.* at p. 1392.)

We find the case distinct. Here, there was no requirement that a hearing—whether actual or documentary—be held by law. Chandran notes that she "was required to submit evidence of her academic qualifications, while the University submitted evidence regarding the disqualification." However, the fact that the parties submitted such evidence does not establish that a hearing was required by law so as to trigger review under section 1094.5. (*Shelden v. Marin County Employees' Retirement Association* (2010) 189 Cal.App.4th 458, 463 ["if the administrative agency provides a hearing but it was not required by law, administrative mandamus does not apply [Citation.]".) Chandran has not provided any evidence that the university was required by law to hold such a hearing in connection with the appeal of her grievance, or any other decision it made.

Accordingly, we will conduct our review in traditional or ordinary mandamus pursuant to section 1085. (See *Manderson-Saleh v. Regents of University of California* (2021) 60 Cal.App.5th 674, 692 [section 1085 used to review administrative decisions that do not meet the requirements of section 1094.5].)

### C. *Standard of review under traditional mandamus*

In an appeal in a mandamus action, we perform the same function as the trial court—therefore, we review the agency's action, not the trial court's decision. (*Martis Camp, supra*, 53 Cal.App.5th at p. 593.) "In such cases, the appropriate standard is whether the agency's action was arbitrary, capricious, entirely lacking in evidentiary support, or failed to follow the procedure required by law. [Citation.]" (*Martis Camp, supra,* 53 Cal.App.5th at p. 593, citing *Citizens for Improved Sorrento Access, Inc. v. City of San Diego* (2004) 118 Cal.App.4th 808, 814.)

22

"Although the 'arbitrary and capricious' standard is not synonymous with the 'substantial evidence' test [citation], there are only subtle differences between them." (*Martis Camp, supra,* 53 Cal.App.5th at p. 595; citing *Bunnett v. Regents of University of California* (1995) 35 Cal.App.4th 843, 849, *Sacramentans for Fair Planning v. City of Sacramento* (2019) 37 Cal.App.5th 698, 707, *California Native Plant Society v. City of Rancho Cordova* (2009) 172 Cal.App.4th 603, 637 (*Rancho Cordova*), *Balch Enterprises, Inc. v. New Haven Unified School District* (1990) 219 Cal.App.3d 783, 892.)

"Under the arbitrary and capricious standard, the question is whether the agency's action has a reasonable basis in law and a substantial basis in fact." (*Martis Camp, supra*, 53 Cal.App.5th at p. 595.) Under that standard, a reviewing court defers to an agency's factual finding " 'unless no reasonable person could have reached the same conclusion on the evidence before it.' " (*Ibid*., citing *Rancho Cordova, supra,* 172 Cal.App.4th at p. 637.)

Similarly, "[u]nder the substantial evidence test, our review begins and ends with a determination of whether there is substantial evidence, contradicted or uncontradicted, to support the findings." (*Martis Camp, supra,* 53 Cal.App.5th at p. 595, citing *Department of Forestry & Fire Protection v. Howell* (2017) 18 Cal.App.5th 154, 192.) A reviewing court does not reweigh the evidence, but instead is "bound to indulge all presumptions and resolve all conflicts in favor of the administrative decision." (*Martis Camp, supra,* 53 Cal.App.5th at p. 595, citing *Amerco Real Estate Co. v. City of West Sacramento* (2014) 224 Cal.App.4th 778, 786.) We need not decide which test should apply here because Chandran's challenges fail under both.

In a mandamus proceeding, the petitioner bears the burden of proof to establish that the agency's decision was arbitrary and capricious or entirely lacking in evidentiary support. (*Branciforte Heights, LLC v. City of Santa Cruz* (2006) 138 Cal.App.4th 914, 934; *Khan v. Los Angeles City Employees' Retirement System* (2010) 187 Cal.App.4th 98, 106; *California Correctional Peace Officers Association v. State Personnel Board*

23

(1995) 10 Cal.4th 1133, 1154 ["petitioner always bears the burden of proof in a mandate proceeding brought under Code of Civil Procedure section 1085"].)

### D. Analysis

As explained above, the university's denial of Chandran's appeal was the final administrative decision. We assume without deciding that, by challenging that final decision, Chandran may also challenge the earlier, preliminary decisions by the law school and reinstatement committee denying her grievance and petition for reinstatement.

Chandran argues on appeal that: (1) the university failed to abide by its own policies and procedures; (2) the findings are not supported by the evidence; (3) the decision is not supported by the findings; and (4) there is no basis for the university's decision. We address these arguments in turn below.

### 1. Whether the university followed its own policies and procedures

Chandran argues that the law school and university failed to follow their own policies and procedures in three distinct ways.

### a. Reinstatement committee's denial of petition

Chandran argues that the reinstatement committee failed to determine whether she had met her burden to show she had the capacity to complete her degree. She contends she carried her burden by making an affirmative showing that she possessed the requisite ability and motivation to succeed academically. Specifically, she had shown she successfully completed 39 units towards her degree, including all spring courses following the plagiarism incidents, and passed all mandatory subjects except the Fall Colloquium. Further, she had received a decision from OCS which contemplated her re-enrollment to complete that class the following school year. And she had submitted the letter of support of Professor Sykes.

Despite that evidence, the reinstatement committee denied her petition with no explanation or rationale. According to Chandran, that demonstrates the committee failed to follow the law school's own policy, which provides: "The Reinstatement Committee

24

shall consider whether the student has met his or her burden of making an affirmative showing that he or she possesses the requisite ability and motivation to succeed academically and that the disqualification does not indicate a lack of capacity to complete studies at the Law School." She argues that "[a]ll the evidence revealed that [she] did have the capacity to succeed in the program."

Although it is not clearly stated, Chandran appears to be arguing that the reinstatement committee failed to follow its own policies because it did not articulate any basis for its decision, and also that its determination was arbitrary and capricious. With respect to the first of those arguments, Chandran has not cited any requirement that the reinstatement committee articulate a basis for its decision; accordingly, we cannot conclude that the failure to do so constituted a failure to follow its own policies or otherwise proceed in the manner required by law. (*Martis Camp, supra*, 53 Cal.App.5th at p. 595.)

With respect to the second of those arguments, we conclude Chandran has failed to carry her burden of demonstrating that the determination was arbitrary and capricious and had no reasonable basis in law or a substantial basis in fact. (*Martis Camp, supra*, 53 Cal.App.5th at p. 595.) While Chandran cites evidence that could have prompted a reasonable decision-maker to grant her petition for reinstatement, we cannot say that no reasonable person could have reached the conclusion the committee reached here based on the evidence before it. (*Rancho Cordova, supra,* 172 Cal.App.4th at p. 637.) On the contrary, the record includes substantial evidence supporting the committee's decision— Chandran's nine F or R credits, and her two instances of plagiarism, the second coming after having been notified of the first.

Chandran argues that the reinstatement policy did not allow the committee to consider the allegations of plagiarism in determining whether to grant her petition. She quotes the language of the policy stating that the committee shall consider whether the student has proved that "the disqualification does not indicate a lack of capacity to

complete studies at the Law School"—that is, did she show she could finish her degree despite her previous bad grades. Thus, she argues, the academic disqualification "was designed to be automatic upon receipt of seven or more credits of F and R grades," and therefore was based solely on her grades, not on the allegations of plagiarism.

We disagree that the committee was precluded from considering the plagiarism incidents. The handbook provides: "The Reinstatement Committee shall consider whether the student has met his or her burden of making an affirmative showing that he or she possesses the requisite ability and motivation to succeed academically and that the disqualification does not indicate a lack of capacity to complete studies at the Law School." While it is true that the academic disqualification was based solely on Chandran's failing grades, the reinstatement committee was required to consider whether the student had shown that she possessed the requisite ability and motivation to succeed academically, considerations which were not limited to grades or the disqualification. The reinstatement policy does not preclude consideration of factors such as multiple instances of plagiarism, or otherwise provide parameters for assessing a student's "requisite ability and motivation to succeed academically."

Although the reinstatement committee did not articulate a basis for its decision, Professor Daines viewed its decision as "a finding that, given her two separate instances of plagiarism and her restricted credits, she did not bear the burden of showing that she possessed the necessary academic ability and capacity for a Stanford Law School degree." He also stated that a student's academic integrity "clearly bears on that standard."

Chandran's reliance on the OCS determination which contemplated her re-enrollment in the program does not compel a contrary result. While on its face, that determination seems incongruous with the denial of reinstatement, the two decisions were made independently, by different entities, and subject to different criteria. The OCS panel was evaluating Chandran's second incident of plagiarism only; its decision to levy

26

sanctions and contemplate re-enrollment did not include consideration of her three failing grades. By contrast, the reinstatement committee was entitled to consider all of that evidence in assessing her requisite ability and motivation to succeed academically.

Similarly, the letter of support from Professor Sykes does not alter the result. Although Chandran argues that the committee ignored that letter, the university concluded, following its investigation and interviews in the context of Chandran's appeal of the grievance, that "[t]hey did consider the input of the Program Director in their review of your case." Chandran has not shown that the committee was required to follow Professor Sykes's recommendation, or that its decision to deny her petition was arbitrary and capricious in light of it. Again, a reviewing court defers to an agency's factual finding " 'unless no reasonable person could have reached the same conclusion on the evidence before it.' " (*Ibid*., citing *Rancho Cordova, supra,* 172 Cal.App.4th at p. 637.)

In sum, we conclude Chandran has failed to demonstrate that the university did not follow its own policies or procedures when it denied her petition for reinstatement.

### b. Timeliness of decision

Chandran argues that the university failed to follow its own policies when it did not make a decision on her petition for reinstatement within two weeks, as required by the handbook, and instead took 51 days. The university does not deny that it failed to comply with that mandatory provision of the handbook. Instead, it argues only that no prejudice was shown from the delay. In denying Chandran's appeal, Professor Bent stated that "there was good cause for the delay in response. This was (and still is) taking place during a global pandemic which is placing a serious time burden on staff and faculty, and I believe that this counts as good cause. More importantly, I found no evidence that the delay in the summer affected the outcome to Ms. Chandran's detriment. In my assessment, the fact that the decision was delayed did not bear on the outcome of either the reinstatement decision or the grievance decision."

27

Even if we were to determine that the university violated its own time policies, we conclude the violation was not so prejudicial as to warrant reversal. As a general rule, " 'procedural due process violations, even if proved, are subject to a harmless error analysis.' " (*Thornbrough v. Western Placer Unified School District* (2013) 223 Cal.App.4th 169, 200 (*Thornbrough*), quoting *Hinrichs v. County of Orange* (2004) 125 Cal.App.4th 921, 928.) " 'A writ of administrative mandamus will not be issued unless the court is persuaded that an abuse of discretion was prejudicial. [Citation.] In other words, the reviewing court will deny the writ, despite abuse of discretion, if the agency's error did not prejudicially affect the petitioner's substantial rights.' [Citations.] " (*Thornbrough, supra,* 223 Cal.App.4th at p. 200.)

Here, there is no evidence that the delay caused any prejudice to Chandran in terms of the outcome of the petition for reinstatement. As Professor Bent stated, "the fact that the decision was delayed did not bear on the outcome of either the reinstatement decision or the grievance decision." In other words, the decision was based on other factors which would have compelled the same result even without the delay.

At the same time, Chandran has not presented any argument that the delay was prejudicial to the outcome of her petition for reinstatement. Instead, she simply declares that the "University's failure to comply with its own policies and procedures is evidence that the University's actions were arbitrary and capricious and should be overturned by this Court." However, a petitioner must demonstrate prejudice and Chandran has failed to do so here.

### c. *Independent review of grievance*

Chandran argues that the university failed to follow its own policies by not conducting an independent review of her grievance. As summarized above, the Student Academic Grievance Procedure provides: "Any student who believes that he or she has been subjected to an improper decision on an academic matter is entitled to file a grievance to obtain an independent review of the allegedly improper decision, followed

28

by corrective action, if appropriate."  Notwithstanding that language, Professor Daines treated the reinstatement committee's decision as "presumptively valid decision, subject only to something like a claim of personal animus, fundamental unfairness or prejudice."

Chandran argues that presumption of validity denied her independent review, in violation of the university's own policies.  In denying Chandran's appeal, Professor Bent and Provost Drell rejected that argument, finding that "Professor Daines conducted a thorough investigation and review trying to be as broad and inclusive as possible in interpretation of his charge to see if there were any grounds on which the decision could be changed."

First, we note that Chandran presumes the term "independent review," as used in the university's policies, necessarily has the same meaning as in an appellate review context, so that the grievance review process must be "de novo."  We do not ascribe that meaning to the term here, though—although not defined, we construe the term to mean that such review is to be conducted by an independent, or different, entity than the one that made the underlying decision.

Second, even if we adopt Chandran's understanding of "independent review," we do not conclude that the university failed to follow its own policy in that regard.  In the context of independent judicial review of an agency's decision, a court must nevertheless "afford a strong presumption of correctness concerning the administrative findings, and the party challenging the administrative decision bears the burden of convincing the court that the administrative findings are contrary to the weight of the evidence."  (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 817.)  As the California Supreme Court explained in *Fukuda*, "there is no inconsistency in a rule requiring [a reviewing body] to begin its review with a presumption of correctness [or validity] of [implied] findings, and then, after affording the respect due to those findings, exercise independent judgment in making its own findings."  (*Id.* at p. 819.)  The university's "presumption of validity"

applied to the reinstatement committee's decision here did not violate the independent review standard.

## 2. *Whether the findings were based on the evidence*

Chandran argues that, "[a]lthough the University made no definite statement about its findings, Professor Daines believed that the decision not to readmit Ms. Chandran was clear evidence that the University made a finding that she did not prove she possessed the necessary capacity to succeed." She contends that "such a finding is not based upon the evidence." Specifically, she argues the evidence proves that she successfully completed all of her courses, "except for the two in which she did not properly cite her sources"; that she "learned how to properly cite her sources and did so throughout the Winter and Spring quarters"; and that she "exceeded the 35-credit requirement needed to obtain a degree and that she successfully completed the residency requirement." According to Chandran, that evidence proves she can successfully pass the Fall Colloquium.

We are unpersuaded. Even if that evidence "proves" she can successfully pass the Fall Colloquium—a question we do not decide—it does not undermine the university's implied finding that, "given her two separate instances of plagiarism and her restricted credits, she did not bear the burden of showing that she possessed the necessary academic ability and capacity for a Stanford Law School degree." Chandran equates the ability to pass the Fall Colloquium with "the requisite ability and motivation to succeed academically," but the two are not necessarily the same. As Professor Daines stated, the university determined that a student's academic integrity "clearly bears on that standard."

## 3. *Whether the decision is supported by the findings*

Chandran argues in the alternative that because the university made no findings, its "decision not to readmit [her] for the sole purpose of finishing one two-credit course is not supported by findings." However, because our review is pursuant to traditional mandamus, no such findings were required. (*Anaheim Redevelopment Agency v. Dusek* (1987) 193 Cal.App.3d 249, 261 [" 'unlike section 1094.5, 1085 requires no written

30

findings of fact in relation to administrative decisions reviewable under that statute' "].) And, even if they were required, the university made findings in support of its final decision denying Chandran's appeal of the grievance.

### 4. Whether there was a basis for the university's decision

Lastly, Chandran argues there was "no basis for the university's decision." She contends the university's determination that the law school "can exempt itself from grievances and can make reinstatement decisions without any structure or guidelines to follow is not reasonable and is a clear misinterpretation of the university's policies and procedures made only to support the arbitrary and capricious decision against [her] in this matter."

As we have already stated, though, the law school's reinstatement decision was not exempt from grievances; instead, the university actually provided a grievance review and an appeal of the grievance. Chandran's argument has no merit.

### III. DISPOSITION

The judgment is affirmed. In the interests of justice, each party is to bear its own costs on appeal. (Cal. Rules of Court, rule 8.278(a)(5).)

                                   _____

                                                  Wilson, J.

WE CONCUR:


_____

Greenwood, P.J.


_____

Grover, J.


<u>Chandran v. Stanford University</u>
H050431